May it please the court, Sarah Coco for the New York State Police. The District Court's decision permanently enjoining the state's private property provision rested on two errors that merit reversal. First, the District Court erred in concluding that none of the state's historical analogs applied to commercial property open to the public. And second, the District Court erred in concluding that all of the state's historical analogs were limited to regulating hunting. Let me start with the first error. This court in Antonyuck recognized that the state had identified laws that could provide evidence of a historical principle of requiring consent, but the court expressed uncertainty about whether those laws, by their plain terms, applied to commercial property open to the public, like the properties Christian is seeking to visit armed in this case. And it invited the state on remand to introduce further evidence about that point, which is what the state did. So take, for example, the state's historical laws from Louisiana, Texas, Florida, and Oregon. Each of these laws prohibit carrying a gun on the premises of another without consent. In additional historical evidence- Can I ask a question before we get into all of the details of the historical evidence? I mean, you'd agree that it can't be the case that you could restrict firearms ownership if you just disagree with the value of the Second Amendment, right? Like, there has to be some other kind of interest going on. I believe that's correct, Your Honor. So the how and why have to be consistent with the how and why of a historical law. Right. So if the law says, so if the New York state is saying we're going to flip the presumption, on private property open to the public because of public safety concerns, there doesn't seem to be any consistent feature of private property open to the public, right? It could be a commercial business. It could be an open field. It could be a private street. It could be like an atrium or something, right? So doesn't that mean that to the extent that it's serving an interest in public safety, it's based on the premise that just the presence of the gun itself is a threat to public safety? No, Your Honor. So I want to be clear. The purpose of the state law here, there's an intertwined public safety purpose that's also intertwined with the rights of the property owner. So the legislature... I'm going to get to that, but what about the public safety justification? So I think these are closely related. The legislature recognized in the sponsor's memo and during the debate on this provision that after Bruin, more individuals in New York would be carrying firearms. That was an inevitable effect of Bruin. And many property owners in New York, the legislature recognized, did not know that the default was that you could carry onto their property without explicit permission. And so the legislature wanted to make sure that they had the opportunity to exercise that right. And that was because property owners may understandably have a concern about an individual coming onto their property with firearms when they're not aware. That could be... Sorry, so you're saying the two things are intertwined. But then let me ask you about that ownership interest. So it's true that a property owner can restrict the exercise of Second Amendment rights on their own property. And that's undisputed. But a property owner could also restrict the exercise of First Amendment rights on their own property, right? If I have private property, I could say, I don't want you saying offensive things here. I don't want you to do your religious ceremonies on my property and so on. Yeah, so this... But could the government pass a law that says the default rule in the state of New York is you're not allowed to engage in offensive speech or religious observance on private property unless the property owner affirmatively authorizes you to? Well, Your Honor, in this context, we're looking to the historical tradition. And here, there is a historical tradition of this consent principle of the state regulating the manner in which the private property owner is expressing consent. In Antoinette, we said if the effect of this default presumption is going to be to seriously burden the ability for people to carry guns and self-defense, it's unconstitutional. That right has been established in, you know, in Bruin, in Heller, McDonald. And the effect of this, you know, if... I think common sense tells us that most business owners or property owners are not going to affirmatively consent. And the result is Judge Van Dyke in the dissent from the re-hearing on Vaughn and Wolford said the only place people will be able to carry their guns is if they're going to wander on the streets aimlessly. And I think that's a valid point. So what's your response to that? How is somebody in New York who wants to carry their gun and defend themselves going to be able to do that with this presumption? So I would strongly dispute that we know the effect of this provision. The provision went into effect for a brief period and then it's been enjoined for nearly three years. But in the brief period, it did go into effect. We have testimony from Christian. This is in the joint appendix at 341, where he says he wanted to visit his store. He called up that store to ask if they would permit him to carry concealed. They said, yes. And by the way, we have a sign at the entrance to our store. Went to the store and confirmed that there was a sign at the entrance. So the effect will depend on what property owners do. And in jurisdictions that require property owners to affirmatively say if they do not want individuals to carry firearms, many, many large national retail establishments do have that policy. So it's not the case that just because the default is one way or another, that's going to govern the entire effect. It's going to be up to the property owner to decide. All right. Let me ask you about the analogs. The Wilford Court essentially, we can go through each one of them, but I think you would agree that other than the Louisiana law in 1865 and the New Jersey law in 1771, that all the other laws either reference hunting in some way or reference a subsection of land, enclosed land, plantation, none of them regulate the ability to carry private land open to the public generally. Would you agree with that? That's what Wilford, even though Wilford came out the way you're arguing here, that was its conclusion. It essentially relied on 1771 New Jersey law and 1865 Louisiana law. I would strongly disagree with that. So I agree with the conclusion in Wilford, but I think our evidence is actually stronger than Wilford recognized. And I want to point out that this court and Antony when considering the hunting point only looked at the Founding Era laws and did not say that any of the Reconstruction Era laws were about hunting. Which Reconstruction Era law doesn't refer to either hunting or enclosed lands, plantations or some limitation subset of land? Which one would you rely on? So the Louisiana, Texas and Oregon laws don't refer to hunting at all. And I think it's clear that their purpose was not hunting. I understand they don't refer to hunting, but the Oregon law says you can't, you have a firearm or trespass on any enclosed premises or lands. So it refers to enclosed lands, right? So this brings me to where I wanted to start, which is that premises is a reference to commercial property. And you can see that in other statutes from the same time period that explicitly use premises that way. So for example, we have a 1843 Alabama law that prohibited merchants and shopkeepers from selling liquor to be consumed on their premises. That's plainly a reference to commercial property open to the public. The same thing is true of an 1859 New York City ordinance that prohibited tavern keepers and other business owners from firing pistols on their premises. And then as to enclosed and improved land, which again, Antonia expressed uncertainty about what that meant. There was a distinction in the founding era between enclosed improved land, which essentially meant land that was developed, occupied, perhaps fenced in, and unenclosed land that was undeveloped. And plaintiffs actually agree with us about the meaning of improved here. What we disagree about is whether commercial property would fit into that category of unimproved or whether it would fit into that category of improved. And again, we have other statutes from the same time period that explicitly- There couldn't possibly be a dispute about that. Why would commercial property be unimproved? Obviously, you've put some effort into putting together a business that's open to the public, right? Well, we would agree with you, Honor. And I think if you accept that premise, then when you see a reference to improved or enclosed property, that includes commercial property. Well, you have to understand those statutes in context, right? So if it's talking about hunting, it's not talking about going on. A lot of the founding era statutes you'd agree are explicit that the purpose is hunting. And so they're not talking about going hunting at a commercial restaurant. They're talking about the distinction between large open fields that are unenclosed, where it seems like the American rule was you could enter onto unimproved land. And then these laws set a default that if it was enclosed or improved, the presumption would be that you could not without consent, right? Well, even as to- So that law is not talking about a commercial business. It is talking about open spaces, right? We would disagree, Your Honor. Even as to the founding era laws, they are not exclusively about hunting. Our position has always been that they're regulating both hunting and poaching and carrying a firearm. And it was common then, as it is now, for statutes to serve multiple purposes. So if you look, for example, at the 1771 New Jersey law, that applied to any land for which the owner pays taxes. But the 1771 New Jersey law begins by saying, whereas the law here to forecast in this colony for the preservation of deer and other game- And to prevent the- Trespassing with guns, traps, and dogs have, by experience, been found insufficient to answer the salutary purpose thereby intended. Therefore, you know, we adopt all the operative provisions. I mean, that is a statement that it is talking about the preservation of game and to prevent trespassing with hunting equipment. So if I'm reading that in context, then why wouldn't I understand it to be about hunting? So if you look at the title of that statute, as Your Honor just read, I'm sorry, I didn't mean to interrupt. It says, an act for the preservation of deer and game. And then it separately says, and to prevent trespassing with guns. So we're relying on that second provision. To prevent trespassing with guns, traps, and dogs, right? That's what the text of the- So what you're saying is I should ignore the part about the preservation of deer and other game. And I should ignore the part about traps and dogs, all of which indicate that it's about hunting. And I should read the few words trespassing with guns in isolation and say, well, actually, New Jersey thought it was a broad prohibition on having guns in any private property unrelated to hunting. Let me try it one more time. Because I do think our position is a little bit stronger than that. So we're relying specifically on Section 1. And Section 1 does not make any reference to hunting, poaching, or deer. And then Section 2 does. So Section 1 is a prohibition on carrying firearms on property without- Yeah, I get it, but the Supreme Court has told us we're supposed to look at both the why and the how, right? Yes, Your Honor. So if the statute begins with a statement of purpose, shouldn't that at least presumptively be the why? If the legislature has said this is the reason why we're enacting this regulation? Well, again- Maybe the broad scope of Section 1 might be probative of the how. But if I'm thinking about the purpose of it, the legislature has told me it's about the preservation of deer and game and trespassing with hunting equipment. I think it says trespassing with guns, which would include any trespassing with guns. That's correct, Your Honor. And so- What about enforcement, though? Bruin has said you can look at the lack of enforcement, and you're suggesting this reading of it. But in the history of the United States, not just in the history of New Jersey, but in all these other statutes that you're pointing to, there's zero evidence of anybody ever being arrested or any type of enforcement against someone who was on private property, more generally, not for hunting, but just on open lands, on private property. Can you cite one instance in the history of the United States where any of these statutes have been used for what you're suggesting they were intended? So I do have one perhaps not totally satisfying example, which is the- Yeah, the Oregon newspaper. Precisely, precisely. But, Your Honor, many- That wasn't enforcement. It said there were kids on some land, and they should know better. That's hardly a basis to regulate Second Amendment rights. But not hunting, shooting off firearms near a schoolhouse. I just want to be clear that many courts and scholars have recognized- Well, it's possible that a law that was designed to limit the harm of unauthorized hunting might encompass other activity. But our inquiry is to look at the purpose of the legislature and why they enacted the law. So even if you're saying the scope of it in Oregon encompassed other activity, that's not necessarily hunting, that doesn't mean that the governmental purpose that justified the law in the first place wasn't something like hunting or the secondary effects of hunting. Just to be clear, as to Oregon, Texas, and Louisiana, there's no reference whatsoever to hunting. There's no evidence whatsoever that the legislative purpose of the statute was to prevent hunting. I think a much better reading on the plain text of those statutes is that there was a public safety and private property protecting purpose. Can I ask you about Louisiana? Because the Wilford Court, again, they called them historical dead renders in New Jersey and Louisiana. And I think they acknowledged, and I assume you would concede, that that law had an invidious discriminatory purpose to make sure that African-Americans couldn't leave the plantations by denying their ability to have firearms. So why should we use that as a basis for restricting the Second Amendment rights of everybody when it was based upon that invidious reason? So I want to make a couple points about this. I think we would not dispute that the Black Codes as a whole had an invidious purpose. But the Supreme Court has recognized that military orders issued by Republican forces at the time were specifically intended to counterman those Black Codes. And we cite a military order that has the exact same consent principle that we're relying on in the state law. So I think this particular example is a little bit more complicated than plaintiffs are acknowledging. The second point I'd like to make- So what you're saying is that that military order is not itself evidence of a tradition, but what it shows is that the Louisiana law was not introduced for the purpose of subjugating African-Americans because the Union Army also enacted a similar order? I think it does support evidence of tradition. So everybody believes that the Louisiana- I mean, everybody seems to agree historically that that Louisiana law was part of the Black Codes. But you're saying, actually, it had a good purpose or a purpose we would recognize as legitimate today. Is that your position? I think our position is that the consent principle specifically would not have been understood at the time to violate the Second Amendment. That's the point that we're trying to make. So not the Black Codes as a whole, but specifically the consent principle, again, relying on the 1866 military order. And in addition, I would point to this court, to the recent decision in Zirka, which specifically said that some historical laws are going to be effectuating historical prejudices. I know, but the purpose of those, even though they were invidiously based, were public safety purpose. It may have been racist views, but the idea was we wanted to have public safety. Whereas this was to keep African-Americans on the plantations. There's no public safety reason to do this. It was to keep them on the plantation so they couldn't be free, right? I'm just not sure there's evidence of that as to the consent principle specifically because of this military order. This was a time of political upheaval. Don't you have the burden of showing that? Don't you have the burden of trying to show that this had some public safety reason behind it? If you're trying to rely on it? So what's your evidence that these Black Code provisions had some public safety element to them or consent element to them? There's no evidence of that. It's all discrimination. Our evidence is that there is this military order, which has nearly identical text as to the specific provision. So that military order was recognizing, of course, the right of all loyal and well-disposed citizens to bear arms. But it also says there is a limit on that right. And the limit on that right is the private property owner's right to tell you not to come onto their property. And you have to get their consent before you enter the property. I just want to go back. And Judge, when Ashley asked this question at the beginning, I want to ask it again. I know you disagree with this idea that we know what people will do, whether or not they will affirmatively consent or not. Let's just assume that that's not going to happen. You would agree people would be unable to carry their guns in New York and defend themselves if there wasn't large-scale affirmative consent by private property owners, businesses, things like that. You agree with that, right? There are specific locations. If the private property owner exercised the right to exclude, they would not be able to carry in those locations. They would, of course, be able to carry in public, on any public land that's not a sensitive place. You could walk along the streets, but you wouldn't be able to go shopping. You wouldn't go into stores, right? Again, that really turns on what the stores themselves decided. And the only evidence in the record here, again, is that Christian asked. And he was told, yes, you can carry. And so in the very brief period when this law went into effect, at least as to one of the places Christian wanted to run errands, he would have been able to do that. Can I get an answer to the question I asked earlier about how this would work in the First Amendment? So you said that the reason this law came into being is Bruin was decided, and the New York legislature said, not every property owner will know that they could exclude people with guns from their property. So New York state is going to set the default at exclusion, unless they opt in. So could you do that with the First Amendment? So let's say the Supreme Court decides net choice, and the New York state legislature says, oh, the Supreme Court says that social media companies can censor speech on their platforms. But maybe not all the owners would know that they're allowed to do that. So we're going to pass a law that says the default rule is going to be that you're not allowed to engage in speech the government defines as offensive on social media platforms, unless the owner affirmatively authorizes it. Would that be a constitutional law? Well, again, Your Honor, I think Bruin created a different test in the Second Amendment context. So here, we look at the how and why, as established by the legislature, and we compare that to a store of information. Maybe you say that they're not analogous, but how would it work in the First Amendment context? Could you have a default rule that says no First Amendment activity on private property unless the owner affirmatively authorizes it? I think that's a complicated question, Your Honor, that would turn on the Supreme Court. Isn't that just a government law that is burdening protected activity by creating this presumption? That would be an easy case. That would be unconstitutional, wouldn't it be? I think it would depend on the level of scrutiny the court applied and what the government's alleged purpose was. So if the government said, we're passing this law to prevent people. Wait, the purpose is to backstop the private property owner's right to exclude. They might not know they have the right to limit speech on their property. So we're going to set the default that speech is limited unless they affirmatively authorize it. So again, I think it would depend on applying the normal scrutiny test depending on what the government's purpose was, whether this really effectuated that purpose. So what if that's the purpose? The purpose is just to reinforce the property owner's right to restrict speech on property. Then I think the government might need to come forward with evidence, for example, that social media companies didn't know what the default was or something like that. But again, that's a very separate test now under the First Amendment with the tiers of scrutiny than what we have with Bruin. All right. Thank you very much. Thank you. We'll hear from Mr. Patterson. Thank you, Your Honors. May it please the court, Pete Patterson for the appellee. And this court should affirm, because the district court correctly determined that New York's presumptive carry ban violates the Second Amendment. I'd like to start with these historical laws that the state relies on. They're different in both the how and the why. These were laws that banned trespassing with firearms, which is the how. The precise line these laws drew was between land where people were not allowed to go without owner permission and land that was open to the public. And that is true even of the New Jersey statute, because it says it's lands for which the owner pays taxes, which was only improved land. Improved lands. And it's important that it says lands, because the Cunningham Dictionary that the state means open fields or lawns without wood. And so that was only lands. Most of the other founding era statutes were with land on plantations, which everyone agrees meant a farm. The one that was not was, well, two that were not. One was a privately owned island where people, you know, couldn't go without the owner's permission. And the other one was in New York City, which talked about orchards, gardens, and corn fields and other lands. So you would read land in connection with those orchards, gardens, and corn fields. And even with respect to the Louisiana statute, which again, these states were not even readmitted to the Union formally after the Civil War when Texas, Louisiana, and Florida passed these laws. So I don't think they should be considered American laws. They were recognized on the floor of the United States Congress. They were told that they were throttling the Second Amendment rights of the freed people by enacting these statutes. But in any event, it applied to, Louisiana's was the broadest. It applied to premises and plantations. But also at JA 1254, Louisiana made it a trespass to go on to another person's plantation without the owner's permission, whether it was enclosed or not. So again, that tracked the line of where people were allowed to go and where people were not allowed to go. And with respect to the why of these statutes, it's, yeah. You had this question about the meaning of premises. Yes. Would that refer to a commercial business? I think premises potentially would refer to just land, like the premises that a person is on. Perhaps theoretically, it could encompass land with a commercial establishment. But that is not what the laws were aimed at. And so, and you should also interpret. So when it's in premises or plantations, it's referring to a farm or an enclosed field. Yes, that's how I would interpret it with respect to the purpose of the law and the surrounding context of those statutes. In any way, with respect to the why, it's clear that the why was to prevent unlawful hunting. That's clear on the face of these statutes. It's clear with respect to these Reconstruction era statutes, which were part of the Black Codes. As Your Honor mentioned, the reason why they were enacted was so that the newly freed people could not support themselves with hunting and had to go back to the plantations to support themselves. Even if the why is about hunting, if they're worried about people going on to somebody else's property and shooting their deer or other game that's on their property, could we extrapolate that into the principle that the state had a role in protecting some property interest of a private property owner from a threat by trespassers with guns? I think that. I mean, I guess you wouldn't agree that this resembles the New York statute. But if New York said, we're going to prevent going onto private property with certain kinds of guns to prevent the environmental damage that could happen if you're running around and doing sport shooting or something, that might look a little like it's a secondary effect of trespassing with guns that the property owner has. And maybe you're allowed to regulate that. Well, I'd say there's no secondary effect of peaceable concealed carry for self-defense. We're not saying people can go and just randomly fire firearms on somebody else's property. So if this law were about that, like no target shooting on private property unless the owner says, OK, maybe there would be some resemblance. But there just is. Right, if you're getting at some other interest. But here it's just saying you shouldn't have guns. Yeah, here it's just saying have guns. So how would you respond to the question I put to the state, which was, isn't this law just about disagreement with the Second Amendment? So because there's no common feature of private property, because it could be a range of types of property, it's hard to say there's something about privately owned property that makes possession of a gun more dangerous. So if there's a public safety interest, it's just based on the assumption that the presence of a gun is a threat to public safety. That's absolutely right, Your Honor. And the reason we know this is because New York was not shy about designating sensitive places. I think there's something like 20 in the law with multiple subparts on those. And so this is only about carrying in places the state has not deemed sensitive in its very expansive notion of places that are sensitive. So yes, it is absolutely just we think the presence of a firearm is a public safety threat. But that is incompatible with the Second Amendment. And just to go to step one, where we say it has to be covered by the text, we think that the recognition of a right to bear arms means that the public balanced the risks of a right to firearms ownership against the public safety risks of that. And you can't reconsider that. So if your only interest is possession of guns as a public safety risk, it seems like that's resolved by the text before you get to whether it's an infringement or an abridgment or something like that. Correct. And there was a case, Simpson v. State, I believe in Tennessee, 1833. I don't think this is cited in the briefs. But it was about whether the statute of Northampton, the fray laws, they would recognize in that state. And they said no, because because of the Constitution, we cannot recognize the presence of a firearm as causing the requisite terror that would invoke this statute. But what about Kucko's argument? Her argument is that it's really a combination of safety and private property rights, and that there are situations where it could be a matter of public safety to have firearms on certain private properties, businesses, for example, where it might be a problem. And their view is that people don't know that they have this right to tell people that can't bring their guns in, and that this default is designed to address the lack of knowledge of private property owners that they even have this right. What's your response to that? Well, they could start an ad campaign to let people know that they have this right. But this is not about private property rights at all. This is about state rights. And the Supreme Court, in the question about how this would work in the First Amendment, we know this already from Brown versus Entertainment Merchants, because California tried this argument with respect to parental rights. And here's what the court said. They rejected the notion that such laws do not enforce parental authority over children's speech and religion. They impose governmental authority subject only to parental veto. So that is exactly what New York is doing here. It's not imposing property rights. It's imposing its sovereign authority to say people cannot carry guns. You're banned. But the property owner has a veto over that. It can allow it. But it's not advancing it. So the argument is, well, even if the parents can prohibit their child from buying a violent video game, if the state comes in and enforces that right or reinforces that authority, it's actually that's a state law that prohibits speech or that sanctions speech or penalizes speech. Well, yes, that's exactly. So I kind of think that is pretty straightforward in the First Amendment context. Yes. But Ms. Coco was saying that the Second Amendment is different. So should the way we think about this in the Second Amendment context be different? No, it shouldn't be different, because the First Amendment has the same analysis. The Supreme Court even adverted to it. The plain text is covered. If the plain text is covered, presumptively, that's covered by the First Amendment. But then we have certain historically supported categories of speech, such as obscene speech or fighting words, things of that nature, that can be restricted. And now there's an additional scrutiny step on the First Amendment, where even if there is not a history and tradition, speech can nevertheless be restricted. But in terms of the text history analysis, it's the same thing. And I think what all the evidence shows is that the actual tradition that New York's law is in is that of abusing a game law to throttle the right to keep and bear arms. This is what happened in England, historically, as the founders well knew in the Second Amendment. In part, it was meant to eradicate that concept. And then the same thing happened in Reconstruction, where Texas, Louisiana, and Florida used a game law to seek to throttle newly gained Second Amendment rights. And that's exactly what New York has done here, the law review article pushing this, before any state did this, I think it was published in 2019 or something, by Ayers and others, said that this had the potential to radically expand the places where people can't carry firearms. So does that mean we should look behind the stated purpose? So I guess you're saying that this is broader than any of the historical analogs. But if New York State passed a law that said, in order to prevent unauthorized hunting, we're going to say that you can't bring a gun onto enclosed lands, meaning fields, to do hunting, would they be allowed to pass that law? Or would you still say that that's pretextual, because their real purpose is to limit Second Amendment rights? I think that's a good question, Your Honor. I mean, I think here, you don't have to look behind it. Because as you said, the only way public safety is advanced here, on their own theory, is if businesses do not consent to allowing firearms. Because the whole theory is having firearms in these places could be a public safety measure. And I will say that Christian's experience is much more mixed than my opposing counsel indicated. At JA, around 337 to 342, the standard result, the most common result he got from inquiring about whether he could carry in places, was no comment. And so because the businesses would not comment one way or the other, he could not carry there. I see my time is up. Thank you, Your Honor. Oh, sure. Before you sit down, what about the argument that one of the amici made, that actually what the default rule does is it prevents the possibility of a confrontation between a gun owner and the property owner, where he asked for permission. And the property owner wants to exclude him. And that could lead to some kind of confrontation. And that's like a public safety risk. I mean, that seems like a wholly speculative reason. And there's no historical support for that, that we would ban guns for that reason. All right. Thank you. Thank you. Ms. Kalko, you have three minutes in the bottom. I wanted to start with this, pick up with this question of how the legislative purpose is considered in the First Amendment context, because I think that is actually helpful here. If you look at United States versus O'Brien, the Supreme Court has said that they're not going to look behind the legislative purpose stated by the legislature if it's constitutional on its face. So they're not going to be looking for evidence of animus where the stated legislative purpose is consistent with the Constitution. And so what we're arguing here is that plaintiffs have not produced any evidence that what the state was really trying to do here is prevent individuals from exercising their Second Amendment rights. That's certainly not the stated purpose of the statute. I just want to quote a couple of the provisions. So if you look at the sponsor memo. If it's a legitimate purpose, if the effect of it is to abridge or infringe the rights, you acknowledge that that would be a problem, right? So I think as to that piece, we're again looking at the historical tradition and seeing if there is a historical tradition. I would just note in brown, in an earlier part of that footnote that my friend was referencing, the court is explicitly saying there's no historical tradition of doing this. So even in that context, they were looking at historical tradition. Here we are arguing that there is a historical tradition. But what about just the general principle in brown that says even though the private party, the parent, does have a right to limit his or her child's First Amendment rights in buying violent video games, for the state to come in and establish a presumption or a need for them to get permission, that is a state law regulating the right. That is, the government cannot come in and simply reinforce the private. They can't restrict the exercise of the First Amendment rights under the guise of reinforcing the private party's right to restrict rights. So what about that principle? So that just means to the extent that a private property owner can restrict a constitutional right, that's fine, but the government cannot come in and try to bolster it or leverage it in order to pass its own law that restricts those rights. So that's not what the state is trying to do here. The state is simply making sure that property owners do have an opportunity to refuse consent. And I want to respond to this idea that there's I mean, whether the default is one way or the other, the property owners have the opportunity to opt in or opt out, right? The question is what the default rule is. Well, in many cases, the property owners may not know that someone is coming onto their property armed because it's concealed carry. Even stronger in Brown, the parents might not know that their kid went to the store to buy a violent video game. And so it makes sense that you might want to give the parent the opportunity to control the media to which their kids are exposed. But the Supreme Court said that was still unconstitutional. Well, here again, I think we have the historical evidence. And I want to point to some of the historical purposes of the founding era laws, which acknowledge that there's grievous danger to the lives of His Majesty's citizens of people coming onto your property with a firearm. That might be because of a confrontation. That could be because there's an accident. That could be because the person has a nefarious purpose. But these historical laws are explicitly recognizing that it could be a danger to the private property owner. And the property owner gets to decide who they want to enter their property. Isn't that argument you just made, doesn't that rest on the premise that just the presence of the gun on the property is dangerous? So the historical laws recognize that there could be a danger. We're not saying it's dangerous in every situation. But there could be a danger. And the property owner gets to decide. Property owners may have all kinds of reasons for refusing to allow someone onto their property with firearms. But we know in many contexts right now that large national retailers do refuse to allow people onto their property with firearms. And so that's not an uncommon preference for the property owner to have. And this is simply allowing the property owner to exercise that preference. If we would conclude that the language of the various statutes that you cite to, the how and why are not consistent with what you're arguing here. They don't provide support. And the only two out there that even the language arguably covers what the state is trying to cover here, New Jersey in 1771 and Louisiana in 1865, would you agree that that would be insufficient? Those would be considered outliers, that we would not base a historical tradition on one state in 1771 and on the Black Code laws in Louisiana, that that wouldn't be enough? Do you concede that? Well, Your Honor, if the court was considering Louisiana as evidence of a tradition, then I think there would be no basis for excluding Texas, Oregon, and the military order. And so when you look at all of those things taken together, then I think we clearly do have enough for a historical tradition. Can you answer my question, though? Assuming we were to conclude the only ones, you know, Wilfred said these were the two dead renders. If we were to conclude, even if we were to conclude they were dead renders, I think there's problems with that. But would that be enough to? I think that would be enough. This court recognized in Antonyuk that three historical laws could be enough to establish a historical tradition. In Bruin, there were three colonial regulations in Bruin, and a state statute and a pair of state door decisions from the 19th century in Bruin said that's not enough. So there, those three colonial regulations were a fray of statutes, and they weren't enough to support New York's proper cause requirement. But that's obviously a very different situation than having dead ringers, which is what Wilfred recognized that we have here. But if the objective is to look for a national tradition, isn't it kind of weird to look at each state law in isolation? Like, if we have a whole bunch of state laws, and they all have pretty similar parallel language, and some of them are explicit about the purpose and the limitations, and some of them are written more broadly and so on, in order to determine what the national tradition is, shouldn't we read them all together to understand how the scope of the right and what an infringement was was understood? Doesn't it seem artificial to say, well, look, it seems like we have a tradition looking at all of these state laws. But there's one state that didn't, like, say what the purpose was, or it didn't have the express conduct element, or something like that. I mean, isn't the natural thing to do to understand those laws that look a lot like the other laws as part of the national tradition, and we should try to determine what the best understanding of the national tradition was, not what one individual law meant? So two responses to that. As to Louisiana law, I just want to emphasize, again, that the Texas, Oregon, and military order are virtually identical. And so there's really no basis for reading those differently. And then in the founding era, I think. But it's not actually right, right? Because the Texas law does talk about enclosed premises or plantation, right? The 1866 Florida law says it's not lawful for a person to hunt or range with a gun within the enclosed land or premises. So I'm focusing on Texas, Louisiana, and Oregon. And I think they have very similar language. OK. All right, thank you. Thank you. Wait, wait, you were going to say some second thing. Thank you. So just very briefly, I think it would be equally reasonable to read the 1771 New Jersey law as being more explicit about the purpose and helping to interpret the other founding era laws, because it does say the purpose is trespassing with guns. OK. All right, thank you. We're going to reserve the session.